**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

REBECCA HACKNEY,
Plaintiff-Appellant,

v.

No. 96-2845

ARLINGTON COUNTY POLICE
DEPARTMENT; ARLINGTON COUNTY,
VIRGINIA,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-96-354-A)

Argued: January 26, 1998

Decided: May 11, 1998

Before WILKINSON, Chief Judge, and HAMILTON and
MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion. Judge Michael wrote a
dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Dennis F. Nee, Bethesda, Maryland, for Appellant. Lisa
Bryant Fowler, Fort Wayne, Indiana, for Appellees. **ON BRIEF:** Bar-
bara S. Drake, County Attorney, OFFICE OF THE COUNTY
ATTORNEY, Arlington, Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant Rebecca Hackney appeals the district court's grant of summary judgment in favor of appellee Arlington County [Virginia] Police Department (the Department) on her claim of unlawful retaliation in violation of the Fair Labor Standards Act (FLSA), see 29 U.S.C. § 215(a)(3). Finding no error, we affirm.

I.

Rebecca Hackney was hired by the Department on May 6, 1979. She began her employment in the position of Police Officer I and was promoted to Police Officer II in 1983. She was subsequently promoted to Corporal in 1987 and to Sergeant in 1991. With the exception of one incident in 1985, for which she received a written reprimand, Hackney's performance was excellent during this period. Her excellent performance was reflected in her performance evaluations and by her several promotions.

In mid-1993, Hackney began experiencing problems at work. Specifically, sometime in the spring of 1993, Hackney began dating one of her subordinates in the Special Operations Section (SOS) of the Department, Officer Chris Dengeles. According to Hackney's co-workers, members of the SOS unit were aware of Hackney's relationship with Dengeles, and fellow officers expressed resentment about favoritism shown by Hackney toward Dengeles. In addition, both Lieutenant Philip Beuchert, Hackney's immediate supervisor, and Chief of Police William Stover reported receiving complaints that there was low morale in the SOS unit as a result of Hackney's relationship with Dengeles. Chief Stover, in particular, received reports that Hackney was giving Dengeles special assignments and that Hackney and Dengeles would "ride off from details and be gone for two, three hours at a time, and no one knew where they were." (J.A. 27).

2

On two occasions during July 1993, Lt. Beuchert discussed specific incidents with Hackney that, while not apparently related to her relationship with Dengeles, were cause for concern. Despite these concerns, however, on August 23, 1993, Hackney received her annual performance appraisal and was rated "superior," receiving excellent reviews in each category.

In a memorandum provided to Hackney in September 1993, Lt. Beuchert noted that although Hackney's performance had been weak during July and August of 1993, he considered the entire year in rating her overall performance for purposes of the annual review. Lt. Beuchert then documented problems with Hackney's recent performance, despite his favorable annual review, and noted specific incidents of poor performance during July, August, and September up to the September 28th date of the memorandum. These included several instances in which Hackney was late to work, including occasions when she and Officer Dengeles both were late, causing other officers to comment unfavorably. In the memorandum, Lt. Beuchert also noted that in response to Hackney's lateness and lack of focus when at work, he had suggested that she take time off to resolve the personal issues which she alleged were the source of these problems. Apparently, Hackney was scheduled to attend "Motor School," during the week of September 13, 1993, and Lt. Beuchert suggested that she not attend in order to get her rest, to resolve personal problems, or to catch up on work. Hackney did not heed this suggestion, and though she attended Motor School, she failed to pass the course. Next, the memorandum detailed instances between September 18 and September 22, 1993, when Hackney failed to fulfill several commitments without contacting Lt. Beuchert. During at least two of these days, when Hackney was ostensibly home sick and when Lt. Beuchert had unsuccessfully attempted to reach Hackney at home, Hackney later admitted that she had been in Nags Head, North Carolina.

In the second part of the September 1993 memorandum, Lt. Beuchert stated his conclusion that Hackney's performance between July and September 1993 needed improvement in decision-making, communication, cooperation, and dependability. For those three months, Lt. Beuchert stated that her overall performance rating was "unsatisfactory." (J.A. 254). Finally, Lt. Beuchert set forth an "action plan," in which he stated that Hackney was capable of being a "superior per-

3

former" but that there were several specific areas of concern which she needed to address. These included favoritism, which required that she be "above reproach" when dealing with Officer Dengeles or any other officer under her supervision, and commitment, which required that she rededicate herself, attending all Department events and meetings on time and with renewed dedication. The memorandum concluded by questioning whether she might desire counseling or whether she had any ideas for the improvement of her performance.

According to Hackney, the source of her problems during this time was a series of illnesses suffered by family members and friends. For example, she had learned that her father was going to lose his eyesight and, as a result, had to go to the doctor often; she had a sister who was diagnosed with multiple sclerosis and was in and out of the hospital; and she had a friend whose son was having asthmatic attacks and had to stay in the hospital. Hackney asserts that she spent many hours at the hospital and some nights, leading to her fatigue at work and her tardiness.

In early October, members of the police department received several anonymous phone calls alleging inappropriate behavior by Hackney. These callers alleged that Hackney was engaging in an affair with one of the "motormen" and other inappropriate behavior. On October 3, 1993, someone left what was apparently a taped message on several police department voice mail message boxes. The message contained similar allegations about Hackney's personal relationships and stated that there were nude pictures that were coming in the mail.[1] In response to these phone calls, Chief Stover ordered an investigation into who was making the offensive calls. In addition, Chief Stover became concerned that Hackney's personal relationships were disrupting the work place.

The investigation ordered by Chief Stover was subsequently conducted by Lt. Thomas Panther, Commander of Internal Affairs. During the investigation, Lt. Panther had extensive discussions with Hackney regarding her relationship with Officer Dengeles. Hackney repeatedly denied that she was having a relationship with Dengeles and insisted that they were "just friends." (J.A. 142). According to Lt.

_____

[1] There is no evidence that any such pictures ever arrived.

4

Panther, despite the general knowledge in the Department that Hackney had engaged in such an affair, she never acknowledged that she was or had been having an intimate relationship with Dengeles. As a result, Lt. Panther concluded that Hackney was not being entirely truthful during the investigation, a conclusion he shared with Chief Stover.

Despite Lt. Beuchert's warnings to Hackney that she engage in conduct that was above reproach, he continued to counsel her between September 1993 and early 1994. On two occasions, in particular, he counseled her about poor decision-making. The first incident involved her decision to have dinner alone with Officer Dengeles in the face of his instructions to her to be "above reproach" in her dealings with subordinates. The second incident involved her decision to permit Officer Dengeles to conceal an audio-video camera in the motorshed to determine who had been pulling his name off his locker.

In April 1994, out of concern for the deteriorating morale in the SOS unit as a result of Hackney's relationship with Officer Dengeles, Chief Stover arranged to have Hackney transferred to midnight patrol. Hackney resisted the transfer, however, and a few days later, Chief Stover agreed to rescind the transfer. Although Chief Stover told Hackney that the transfer would be good for her professionally because it would give her experience in another area of the Department, giving her a broader base of experience and making it more likely she would eventually be promoted to lieutenant, she insisted that she did not want to transfer and he ultimately agreed.

On April 6, 1994, following the rescission of the decision to transfer Hackney, Lt. Beuchert met with Hackney to discuss her current level of performance and suggestions for improvement. During this meeting, Lt. Beuchert reviewed with Hackney his concerns about her performance during the fall of 1993 and her continued failure to make improvements. In addition, he discussed strategies for improvement.

Despite these problems, Hackney was again evaluated in August 1994 in her annual review and was given an overall rating of "exceeds" from Lt. Beuchert. (J.A. 229). The performance evaluation stated, in particular, that Hackney's administrative skills were excellent; that no sergeant handled a higher volume of work; that she main-

5

tained a positive attitude; that she monitored and encouraged others to be safety-conscious; that she had continued to increase her contacts with other agencies; and that she handled various and diverse complaints, often helping the front counter personnel handle uncooperative citizens.

On April 13, 1995, some of the sergeants in the Department, including Hackney, filed suit in the United States District Court for the Eastern District of Virginia against the Department, claiming violations of the FLSA. See Gabrielson v. Arlington County, Civil Action No. 95-484-A (E.D. Va.). In the suit, the sergeants contended that they were not supervisors and, therefore, that they were entitled to overtime pay under the FLSA.

In May 1995, Richard Alt was promoted from sergeant to lieutenant effective May 28, 1995, and was assigned to the SOS. At the time Alt was promoted, Hackney was also eligible for promotion and had been given the highest score of all five eligible individuals by the personnel department, which provides a list of certified candidates to Chief Stover. Richard Alt had the second highest score, and according to Chief Stover, Alt was promoted over Hackney because Alt had broader experience in the Department, having worked in all three divisions, and was the most qualified individual considering dependability, integrity, judgment, decision-making, and education. In comparison with Hackney, in particular, Chief Stover stated that he did not select Hackney because of her performance problems during 1993 and 1994 and her lack of truthfulness during the internal affairs investigation concerning the phone calls to the Department. Chief Stover also stated that while the rank order on the promotion-eligible list is a consideration in determining whom to promote, other considerations, such as dependability, integrity, and judgment are also considered. Chief Stover stated further that generally he has not selected personnel for promotion in the rank order arising from the personnel department assessment. According to Chief Stover, Hackney's status as a plaintiff in the FLSA lawsuit had "absolutely no bearing" on his decision to promote Alt to lieutenant rather than Hackney. (J.A. 128).

Upon learning that Alt had been promoted, Hackney went to see Chief Stover and asked him why she had not been promoted. In her deposition, Hackney testified that in response to her question, Chief

6

Stover stated that "first of all, [he] was very disappointed to see that [Hackney was] suing for . . . FLSA standards" and that "it didn't show true leadership." (J.A. 122). In addition, Chief Stover told her that he did not believe that she was ready to be promoted to lieutenant.

Several months later, in August 1995, Lt. Beuchert completed another annual evaluation of Hackney's performance. In his deposition, Lt. Beuchert stated that when he initially completed the evaluation, he had rated Hackney's decision-making skills, one of fifteen categories of performance evaluated, as "exceeds." However, upon submitting his draft evaluation to Deputy Chief of Police Gregory Brewer, Deputy Chief Brewer showed Lt. Beuchert a copy of a document submitted in connection with the FLSA lawsuit and signed by Hackney. According to Deputy Chief Brewer, the document "was a gross misrepresentation of what [Hackney's] job was." (J.A. 60). After discussing the document with Deputy Chief Brewer, Lt. Beuchert changed his evaluation of Hackney's decision-making skills from "exceeds" to "satisfactory."

On March 15, 1996, Hackney filed this action in the United States District Court for the Eastern District of Virginia. In her complaint, Hackney alleged that she had been denied a promotion in May 1995, restricted from working overtime in August 1995, and denied a promotion in March or April 1996 in retaliation for her participation as a plaintiff in the FLSA suit.

On November 1, 1996, the Department filed a motion for summary judgment as to all of Hackney's claims. On November 15, 1996, the district court granted the Department's motion, holding that the Department had articulated legitimate, non-retaliatory reasons for each employment decision at issue and that Hackney had failed to show that the Department's stated reasons were pretextual for unlawful retaliation. Hackney noted a timely appeal. [2]

———————————————————————————————————————

[2] Hackney initially appealed the district court's decisions with respect to the May 1995 promotion, an August 1995 decision to limit eligibility for overtime by certain officers, and a March 1996 promotion. However, she has since abandoned her claims based on the Department's decisions to limit certain officers' overtime in August 1995 and to promote another

7

II.

We review a district court's decision to grant summary judgment de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing the district court's grant of summary judgment, we must construe the facts in the light most favorable to the non-moving party. See Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (en banc).

III.

Section 215(a)(3) of the FLSA provides, inter alia, that it is unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). Courts agree that an adverse employment action is unlawful under the FLSA's anti-retaliation provision only if it would not have occurred "but for" the employer's retaliatory intent. See Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1394 (10th Cir. 1997); McKenzie v. Renberg's, Inc., 94 F.3d 1478, 1483 (10th Cir. 1996), cert. denied, 117 S. Ct. 1468 (1997); Knickerbocker v. City of Stockton, 81 F.3d 907, 911 (9th Cir. 1996); Reich v. Davis, 50 F.3d 962, 965 (11th Cir. 1995); Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 877-78 (2d Cir. 1988). As in cases in which the plaintiff alleges unlawful discrimination in violation of Title VII, a plaintiff asserting a cause of action under § 215(a)(3) may proceed under either of two methods of proof. See Fuller v. Phipps, 67 F.3d 1137, 1141-43 (4th Cir. 1995) (discussing proof scheme differences depending on whether plaintiff produces direct evidence of

_____

officer to lieutenant in March 1996. Thus, the only issue remaining for the court to decide is whether the district court erred when it held that Hackney had not produced sufficient evidence from which a reasonable jury could conclude that the Department's failure to promote her to lieutenant in May 1995 was in retaliation for her participation in the FLSA lawsuit.

8

discrimination or, alternatively, relies solely on circumstantial evidence). First, where the plaintiff has produced direct evidence that her employer was motivated by retaliatory animus, she may proceed under the "mixed motive" proof scheme enunciated by the Supreme Court in the context of a First Amendment retaliation claim in Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977). See, e.g., Knickerbocker, 81 F.3d at 911; Brock, 839 F.2d at 877-78; see also NLRB v. Transportation Management Corp., 462 U.S. 393, 400 (1983) (upholding NLRB's application of Mt. Healthy proof scheme to allegations that an employer committed an unfair labor practice by unlawfully retaliating against an employee for engaging in union activity), overruled in part on other grounds, Department of Labor v. Greenwich Collieries, 512 U.S. 267, 276-78 (1994). Alternatively, where the plaintiff relies on circumstantial evidence to prove that retaliatory animus motivated the employer to take the disputed adverse employment action, she must proceed under the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Conner, 121 F.3d at 1394.

In this case, Hackney is entitled to a "mixed motive" analysis because she has produced direct evidence that Chief Stover, the decisionmaker, acted with retaliatory animus when he decided not to promote Hackney to lieutenant in May 1995. Specifically, Hackney stated in her deposition that when she asked Chief Stover why she had not been promoted, he responded that he "was very disappointed to see that [Hackney was] suing for . . . FLSA standards" and that "it didn't show true leadership." (J.A. 122). Although Chief Stover also gave Hackney other, non-retaliatory reasons for his decision, Hackney's deposition testimony is evidence that "both reflect[s] directly the alleged [retaliatory] attitude and . . . bear[s] directly on the contested employment decision." Fuller, 67 F.3d at 1142 (explaining what type of evidence is required to entitle a plaintiff to a mixed motive analysis in Title VII disparate treatment case). Therefore, we assess Hackney's evidence supporting her claim of unlawful retaliation in violation of the FLSA under a mixed motive proof scheme.

Under the mixed motive proof scheme, a plaintiff must first produce sufficient evidence from which a reasonable jury could conclude that her protected activity under the FLSA was a "substantial" or "motivating" factor in the employer's decision to take the disputed

9

adverse employment action. See Knickerbocker, 81 F.3d at 911; see also Mt. Healthy, 429 U.S. at 287. If the plaintiff succeeds in this task, the burden shifts to the defendant to prove that it would have made the same decision even in the absence of the protected activity. See Knickerbocker, 81 F.3d at 911. That is, the employer has the burden to prove by a preponderance of the evidence that the plaintiff's protected activity was not the "but for" cause of the adverse employment action. See id.

In this case, based on her direct evidence of retaliatory animus alone, Hackney has produced sufficient evidence from which a reasonable jury could conclude that her participation in the FLSA lawsuit was a motivating factor in Chief Stover's decision to promote Richard Alt to lieutenant over Hackney in May 1995. Taking Hackney's deposition testimony as true, we must assume that when asked directly why he had not promoted Hackney to lieutenant, Chief Stover gave as one of his reasons that Hackney's participation in the FLSA lawsuit evidenced a lack of leadership. Thus, Hackney has met her initial burden to prove that her protected activity was a motivating factor in Chief Stover's decision not to promote her in May 1995.

The next issue is whether the Department has met its burden of proving by a preponderance of the evidence that, even in the absence of Hackney's participation in the FLSA lawsuit, she would not have been promoted to lieutenant in May 1995. More precisely, in the context of reviewing a grant of summary judgment in favor of the Department, we must determine whether the evidence supporting the Department's position is so strong that a reasonable jury could only conclude, in light of the Department's evidence, that Hackney would not have been promoted in May 1995, even if she had not participated in the FLSA lawsuit. We believe that the Department has met this considerable burden.

First, it is undisputed that beginning in the spring of 1993, Hackney began dating one of her subordinates in the SOS unit, Officer Dengeles. It is also undisputed that this relationship was the source of some resentment among members of the SOS unit, who believed that Hackney was showing favoritism toward Dengeles, and that as a result of Hackney's relationship with Dengeles, the unit suffered from low morale. Chief Stover received reports of these problems and

10

heard specifically that Hackney was giving Dengeles special assignments and, while on duty, disappearing alone with Dengeles for hours at a time. In addition, Hackney was counseled about this relationship on more than one occasion and was instructed to be "above reproach" in her dealings with Dengeles and other subordinates. Nevertheless, even after she was instructed to make sure that her conduct was above reproach, the Department received a number of disruptive phone calls, alleging that Hackney was engaging in an affair with one of the "motormen" and other inappropriate behavior. Next, Hackney had dinner alone with Dengeles on one occasion, and on another occasion, Hackney permitted Dengeles to conceal an audio-video camera in the motorshed to determine who had been pulling his name off his locker.

Perhaps more troubling, Hackney never acknowledged the existence of anything more serious than a good friendship with Dengeles, even when questioned directly about the relationship by Lt. Panther during the Department's investigation into the anonymous phone calls charging that Hackney was engaging in inappropriate behavior. Because of Hackney's unwillingness to acknowledge the relationship, Lt. Panther concluded that Hackney was not being entirely truthful during the investigation and reported this conclusion to Chief Stover.

Also during late 1993 and early 1994, Hackney was often tardy to work and lacked the focus and dedication she had previously brought to her job. During a four-day period in September 1993, in particular, Hackney failed to fulfill several commitments and, in addition, failed to notify her supervisor, Lt. Beuchert. In addition, when Lt. Beuchert attempted to contact Hackney who was ostensibly unable to come to work because she was sick, he was unable to locate her at home. Hackney later acknowledged that she was not home sick, but rather spent this time in Nags Head, North Carolina. Although Hackney blames her lack of focus on the illnesses of family and friends, she does not dispute that her performance deteriorated during this time.

In light of these serious breaches of duty committed by Hackney during 1993 and 1994, it would be surprising if she had been promoted to lieutenant in the spring of 1995. In addition to relying on mistakes made by Hackney, however, Chief Stover also explained that he decided that Alt was better suited for the lieutenant's position than Hackney because Alt had experience in all three divisions of the

11

Department, while Hackney's experience was limited to the SOS unit. This assertion is supported by his suggestion to Hackney in April 1994 that she transfer to midnight patrol, in part, to give her a broader base of experience making it more likely that she would eventually be promoted to lieutenant. Hackney nevertheless rejected this transfer, and at the time Chief Stover decided to promote Alt to lieutenant, Hackney lacked the diverse experience within the Department she had been told she needed for promotion to lieutenant. **3**

All of this evidence establishes that even in the absence of Hackney's participation in the FLSA lawsuit, she would not have been promoted to lieutenant in May 1995. It is true that Hackney received only positive performance evaluations during 1993 and 1994, notwithstanding her problems concerning Dengeles and a lack of focus. However, despite these evaluations, it is undisputed that she experienced these problems and that she was counseled on numerous occasions to correct them. It is also true that the personnel department had given Hackney the highest promotion score on the promotion list. However, it is not clear how much the personnel department knew about the problems Hackney had been having, and each of the five candidates on the promotion list was qualified for the promotion. Chief Stover was thus free to choose any one of them. According to Chief Stover, the rank order on the promotion list is not the most important consideration when deciding on a particular promotion, and he generally does not promote the candidate given the highest assessment by the personnel department. Rather, he considers dependability, integrity, and judgment to be equally important.

_____

**3** In dissent, Judge Michael makes much of the fact that the evaluation of Hackney's decision-making skills was reduced from"exceeds" to "satisfactory" in her August 1995 performance evaluation, asserting that this incident could be considered evidence of a "cover-up" within the department relating to the failure to promote Hackney. We disagree. First, Hackney's performance evaluation was reduced slightly in only one of fifteen categories on one evaluation, hardly evidencing a department-wide cover-up. Second, according to Deputy Chief Brewer, it was not Hackney's participation in the lawsuit that concerned him, but the belief that she had grossly misrepresented her duties in the context of that lawsuit. Finally, this evaluation was completed months after the decision at issue in this case and, therefore, was not considered by Chief Stover at the time he made the decision not to promote Hackney in May 1995.

12

When choosing which of his officers should be promoted to lieutenant, one of the highest positions in the Department, Chief Stover was charged with the responsibility of choosing between several qualified candidates. At the time he made his decision, Chief Stover was aware of Hackney's performance problems and her lack of truthfulness during the phone call investigation. There is no evidence that Alt had experienced similar problems. In addition, Alt enjoyed a broader base of experience within the Department, a quality Chief Stover testified was particularly important at the level of lieutenant. The overwhelming evidence, then, demonstrates that Chief Stover's decision to promote Alt to lieutenant over Hackney in May 1995, even if influenced, in part, by Hackney's participation in the FLSA lawsuit, would have been the same even if Hackney had not engaged in protected activity. The Department's evidence on this point is so overwhelming, in fact, that no reasonable jury could conclude that "but for" Hackney's protected activity she would have been promoted in May 1995.

IV.

For the foregoing reasons, we affirm the decision of the district court to enter summary judgment in favor of the Department as to Hackney's claim that she was retaliated against in violation of § 215(a) of the FLSA when she was denied the promotion to lieutenant in May 1995.

AFFIRMED

MICHAEL, Circuit Judge, dissenting:

I respectfully dissent.

I do agree with the majority that Sergeant Hackney "produced sufficient evidence from which a reasonable jury could conclude that her participation in the FLSA lawsuit [against the Arlington County Police Department] was a motivating factor in Chief Stover's decision to promote [Sergeant] Alt to lieutenant over Hackney in May 1995." Maj. op. at 10. Because this is a mixed-motives case, the department has the burden to show by a preponderance of the evidence that Hackney would have been passed over regardless of her involvement in the

13

FLSA lawsuit. The department did present evidence from which a rational jury could conclude that it satisfied this burden. However, I do not believe that this evidence was so overwhelming or so uncontroverted "that a reasonable jury could <u>only</u> conclude . . . that Hackney would not have been promoted in May 1995, even if she had not participated in the FLSA lawsuit." Maj. op. at 10 (emphasis in original). There remain several material questions of fact which, if resolved in Hackney's favor, could lead a rational jury to conclude that Hackney would have been promoted "but for" her involvement in the FLSA lawsuit.

Sergeant Hackney testified that Chief Stover admitted to her, when she asked him why he had not promoted her, that his <u>first</u> reason was that she was a plaintiff in the FLSA lawsuit. (Hackney made and kept written notes of the meeting in which the Chief made this admission.) This evidence alone was enough to permit a jury to conclude that Hackney's involvement in the FLSA lawsuit was the "but for" cause of Chief Stover's failure to promote her. To hold otherwise is to take on the job of a jury, which could accept Hackney's testimony about Chief Stover's admission and reject the Chief's testimony that he would not have promoted her in any event.

In addition to her direct evidence of Chief Stover's retaliatory motivation, Hackney offered substantial circumstantial evidence to show that she was passed over for a promotion as a result of her involvement in the FLSA lawsuit. First, Hackney offered evidence that she was well-suited for the promotion. She was an excellent officer over a 16-year period with the Arlington County Police Department. In the two years before she was passed over for promotion, she received departmental ratings of "Superior" (the highest) for 1993 and "Exceeds" (next to highest) for 1994.[1] Over her career Hackney received numerous commendations from both inside and outside the department.

_____

[1] The department contends that these ratings are irrelevant because Chief Stover testified that he does not consult personnel files when making decisions about promotions. I think it might be hard for a jury to believe that a police department makes detailed formal evaluations of its officers' performance, and yet entirely disregards those evaluations when making promotion decisions.

14

Second, Hackney presented evidence which suggested that in the normal course of things she -- not Sergeant Alt-- would have been promoted to lieutenant in the Special Operations Section (SOS). Hackney was the top candidate left on the lieutenant eligibility (promotion) list in May 1995 and Alt was second on that list. Although Chief Stover said in his deposition that he did not always promote the top candidate on the promotion list, the evidence in the record could have led a jury to draw the contrary conclusion. On the record before us, it appears that the Chief promoted three sergeants to lieutenant in Spring 1995, and two of those were at the top of the promotion list when they were made lieutenants. The only time in Spring 1995 that Chief Stover did not promote the top sergeant on the list was when he promoted Alt (who was second) over Hackney (who was first). Yet, even then Chief Stover chose the top person on the list if Hackney, who was involved in the FLSA suit, was excluded.[2]

Further, although Chief Stover testified that Alt was better suited for promotion than Hackney because the department needed new lieutenants (like Alt) with prior experience in several units, a jury could have concluded that Stover in fact felt otherwise. The Chief admitted in his deposition that what the department needed in May 1995 was a new lieutenant in its SOS unit, and it was uncontested that Hackney had more experience in SOS than did Alt. Further, although "there is no evidence that Alt had experienced similar problems" to those Hackney allegedly experienced at work, Maj. op. at 13, Alt's record was not unblemished. In his deposition Alt admitted that he had been disciplined twice in the five years prior to his promotion.

Third, Hackney forecast evidence to show that the department's proffered reasons for not promoting her, poor decision making and lack of attention to her job, were false. The department claims that Hackney dated a subordinate, Officer Dengeles, whom she favored (some said) with better work assignments. The department also

_____

[2] Although Alt initially had been part of the coalition of sergeants that eventually filed the FLSA lawsuit, he dropped out of the coalition after he learned of his position on the promotion list (this was before the complaint was filed). In his deposition Alt admitted that he dropped out because he thought his involvement in the coalition might hurt his chances for promotion.

15

asserts that Hackney was not truthful about her relationship with Dengeles. However, Chief Stover admitted that there was no rule against dating subordinates, saying that departmental rules only prohibited preferential treatment. Although Hackney's relationship with Dengeles was investigated by Internal Affairs, it appears that there were no findings that Hackney gave preferential treatment to Dengeles with respect to his work as a police officer. In any event, neither Hackney nor Dengeles was disciplined as a result of their relationship. Further, Sergeant Hackney vehemently denies that she lied about her relationship with Dengeles. She said:

> The only Arlington County Police Officer who asked me about my personal connection to Chris Dengeles was Deputy Chief Brewer who inquired whether I was having a"sexual relationship" with Officer Dengeles. I responded that I am not going to answer questions pertaining to my personal life. I never denied having a relationship with Officer Dengeles.

If a jury believed Hackney rather than her superiors, it could conclude that the department did not find fault in Hackney's relationship with Dengeles and, thus, that this proffered reason (poor decision making) for failing to promote Hackney was pretextual.

The department also says that Hackney's outstanding level of performance dipped in the summer of 1993 and remained at a lower level throughout early 1994. Hackney concedes that her work suffered for a brief period in July and August 1993, but she says there were justifiable reasons for that. During this time, her sister was diagnosed with Multiple Sclerosis, and her father (who was a diabetic) was losing his eyesight and was making frequent trips to the doctor. Hackney also spent time with a friend whose son was hospitalized with a serious asthma condition. Hackney said that supporting her family and friends, often at nightlong vigils at hospitals, did impair her stamina in July and August 1993. Thereafter, she says that her high level of performance resumed.

There is support in the record for Hackney's claim that her overall performance at work was not affected by her performance in July and August 1993. In her 1993 performance evaluation (conducted in

16

August 1993), her supervisor, Lieutenant Beuchert, said: "Sergeant Hackney has had an outstanding year & has received a superior rating for her contributions for this appraisal." Further, Hackney's 1993 performance appraisal said that she was an excellent role model. In Hackney's 1994 performance appraisal, Lieutenant Beuchert commented that she "continues to maintain [a] good decision making batting average." Hackney's overall performance also remained at a high level for 1994, rating a score of "Exceeds." Since Hackney's own supervisors continued to give her glowing reviews during the period in which the department claims her work suffered, a jury could find that the department did not really believe her work suffered. From this the jury could conclude that the department's second proffered reason for failing to promote Hackney (lack of attention to work) was also pretext.

In 1995 Hackney maintained a high level of performance, although one of the ratings (for decision making) on her 1995 evaluation was listed as "Satisfactory." Hackney proffered evidence to explain this lower rating, however. In his deposition Beuchert admitted that after he drafted Hackney's 1995 performance evaluation, his superior, Deputy Chief Brewer, showed him a copy of Hackney's answers to some interrogatories in the FLSA lawsuit. According to Beuchert, Deputy Chief Brewer persuaded him that Hackney's answers demonstrated poor decision making. Beuchert further admitted that Deputy Chief Brewer convinced him (Beuchert) to reduce Hackney's decision-making score from "Exceeds" to "Satisfactory" on the final version of her 1995 appraisal. Deputy Chief Brewer also admitted that he had asked Beuchert to downgrade Hackney's decision-making score on the 1995 evaluation because of her answers to the interrogatories from the FLSA suit.

This evidence that Hackney's superiors changed their own formal appraisal of her decision making based on the FLSA lawsuit, after they decided not to promote her, is further evidence that the department did not believe Hackney exhibited poor decision-making skills. This evidence does more than just explain Hackney's average decision-making grade for 1995, however. It also raises the specter of a cover-up within the department relating to the failure to promote Hackney. If a jury concluded that such a cover up existed, it could

17

well conclude that both of the department's proffered reasons for not promoting Hackney were simply after-the-fact excuses.

In sum, I believe Sergeant Hackney offered evidence that would allow a rational jury to conclude that the department's proffered reasons for not promoting her (poor decision making and insufficient attention to work) were pretextual. Moreover, as the majority acknowledges, Hackney presented direct evidence from which a reasonable jury could find that an impermissible reason (her involvement in the FLSA lawsuit) motivated the Chief's decision not to promote her. Since Hackney offered evidence that an improper reason motivated Chief Stover, and since she also offered evidence that the official reasons for not promoting her were pretextual, a rational jury could decide that the FLSA lawsuit was the only reason that Hackney was not promoted.

This case, like many mixed-motives cases, "is not grist for the summary judgment mill," Adler v. Madigan, 939 F.2d 476, 479) (7th Cir. 1991). Two questions are at the heart of this case: (1) was Hackney telling the truth when she said that Chief Stover told her that he did not promote her because of her involvement in the FLSA lawsuit; and (2) was Chief Stover telling the truth when he said that he would not have promoted Hackney regardless of the FLSA lawsuit. These are classic jury questions, and they are material to the outcome of this case for one reason: if a jury accepted Hackney's testimony and rejected Stover's, it could find for Hackney. Because there are material questions of fact, summary judgment for the defendants was inappropriate.

This case should go to trial.

18